[Civ. No. 12158. First Dist., Div. One. Dec. 12, 1942.]

A. J. TREAT, Plaintiff and Appellant, v. ROBERT CLAR-
ENCE OGDEN, Defendant and Appellant.

Thomas C. Nelson for Plaintiff and Appellant.

Arthur W. Brouillet for Defendant and Appellant.

BRAY, J. pro tem.—Appeals by both parties from the decree of accounting in a partnership dissolution, the plaintiff appealing from the entire decree, as well as from parts of it, the defendant appealing from portions of the decree.

The case concerns the division of fees of a partnership for the practice of law. The partnership arrangement between the parties up to the year 1930 is undisputed. As to the arrangement thereafter the parties are diametrically opposed. The partnership commenced July 26, 1927, under a written agreement between the plaintiff Treat and the defendant Ogden. The partnership agreement provided that the partnership should continue until the expiration of the lease from the Standard Oil Company of the partnership offices. This lease expired December 21, 1929, but the partnership

continued without any further writing or formal action of the parties until April 15, 1938.

At the time of the formation of the partnership, both plaintiff and defendant were practicing lawyers of many years' experience. Under the written agreement, plaintiff was to receive 58 per cent of the net earnings and defendant was to receive 42 per cent thereof. On June 15, 1930, plaintiff Treat was severely injured by being struck by a golf ball. This incapacitated him so that for some time he was unable to carry on the practice of the law, and the burden of the entire practice fell on his partner, the defendant. Because of this fact, shortly after the injury, an oral agreement was made between the parties that thereafter the fees would be equal instead of in the proportion set forth in the written agreement, which proportion was still being followed although the term set forth in the written agreement had really expired about a year before. The recovery of plaintiff from the accident was gradual and it was some considerable time before plaintiff was able to devote his entire time to the law practice.

At this point the parties diverge. Plaintiff contends that this oral agreement that the fees should be divided equally thereafter was never changed; defendant contends and the court found, that by subsequent oral agreements it was changed. The appeals by both parties are really a series of appeals. It is simpler and clearer to discuss, one by one, the items in the decree objected to by each party.

Plaintiff first contends that the court erred in applying any basis of division except that set forth in the written agreement, even though he admits that the parties did agree to the fifty-fifty basis after his injury. He contends that, as a matter of law, such oral agreement is an attempt to vary the terms of a written instrument by parol, and that such agreement is only binding as to fees which the parties themselves divided that way and which are not in controversy here, and which amounted to an executed oral contract. In other words, plaintiff contends that all fees received by the partnership and not accounted for to each partner must be divided in accordance with the written agreement because any oral unexecuted agreement for their division would be void, under Civil Code, section 1698.

This contention, however, ignores the fact that the writ-

ten agreement had really terminated, or at least, the provision concerning the length of the partnership no longer applied. The term of the partnership set forth in the writing had expired, and the parties were really operating under an oral agreement to continue the partnership on the terms set forth in the agreement.

The parties did not actually make an agreement in so many words to continue on, after the lease expired, but they did continue on, and the effect is the same as an oral agreement to extend the written agreement. Civil Code, section 2417, states: "When a partnership for a fixed term or particular undertaking is continued after the termination of such term or particular undertaking without any express agreement, the rights and duties of the partners remain the same as they were at such termination, so far as is consistent with a partnership at will. (2) A continuation of the business by the partners or such of them as habitually acted therein during the term, without any settlement or liquidation of the partnership affairs, is prima facie evidence of a continuation of the partnership." "So far as consistent with a partnership at will" necessarily requires the right to modify the terms of the agreement, and as the writing itself was no longer the measure of the life of the partnership, the same method that was used to extend that life, an oral agreement, must necessarily be the method for changing any other term of the agreement. Section 2417, Civil Code, provides in effect that under the circumstances here the parties were partners at will. Both parties agree that after plaintiff's injury in June, 1930, they agreed that the division thereafter should be equal between them, although now plaintiff contends that such agreement was illegal. The written agreement continued in effect by the equivalent of an oral agreement so to do, by reason of the application of section 2417, Civil Code, did not provide for any definite period the partnership was to continue on. Therefore, the oral agreement in 1930 could be construed to be a termination of the old agreement and the entering into of a new one, although it is not necessary to hold that the written agreement terminated. It is probably a better construction of the situation to hold that the old agreement was continued in effect by the conduct of the parties in treating it as such. Both parties treated the agreement as

still in effect as to practically all its terms, except those as to divisions of fees. In any event, the oral agreement was binding on the parties, and the court was justified in so finding. Therefore, the division of the fees made by the court from June, 1930, until the time when the court found that the basis of division was again changed by an oral agreement is correct.

In his brief, plaintiff makes some reference to the necessity of consideration for any change in the basis of division of fees. It is not clear whether plaintiff claims that in this case there was no consideration for such change. Certainly the incapacity of plaintiff and the fact that defendant had to perform all the work of the partnership for a while and thereafter most of the work for a very long period, were consideration enough for the changes of the division basis. While in the absence of an express agreement a partner who performs all the work of the partnership during the illness of his partner is not entitled to compensation or an extra share, still, the fact that he will have to perform such extra services is sufficient consideration for the making of an agreement to compensate him therefor.

### The Medical Center Properties, Inc. Note.

The first specific item objected to by plaintiff centers around a promissory note of the Medical Center Properties, Inc., which corporation will hereinafter be referred to as the Medical Center. Besides the firm acting as attorneys for this corporation, defendant was a director and also its secretary. Plaintiff was its stock transfer agent. Commencing with August, 1931, defendant received as secretary a salary of $30 per month from the Medical Center. January 1, 1935, this salary was increased to $50 per month, and on January 1, 1936, it was increased to $100 per month. In March, 1934, the corporation executed its promissory note in favor of defendant in the sum of $1,730.77. During the same period covered by the salary payments, the Medical Center became indebted to the partnership for legal services rendered. Defendant testified that the moneys paid him each month by the Medical Center for his salary, as secretary, he turned into the partnership account, crediting such sums to the legal fees. In March, 1935, the Medical Center was billed by the partnership for legal services in the sum of $2,230, which the cor-

poration paid by $500 in cash and the note to defendant alone in the sum of $1,730.77. Defendant kept this note and the proceeds therefrom, on the theory that the moneys which he had received as salary were his personal property and not that of the firm, and that he was entitled to reimbursement from the firm for the salary which he had theretofore turned into the partnership. Plaintiff contends that the work performed by defendant as secretary was really of a legal nature, that the partnership's office facilities were used for it, that the partnership office secretary did most of the work anyhow, and that the payments by the Medical Center to defendant as secretary were really a retainer to the partnership for legal work. Defendant denied this and in addition, testified that it was understood and agreed by plaintiff that the defendant's secretary salary was not to be partnership funds. The court made no express finding upon this issue. However, inasmuch as, after considering all claims of each party and allowing, and disallowing certain claims of each, the court found that there was a balance due from defendant to plaintiff in the sum of $566.22, there is an implied finding that defendant's contention in this respect was correct. By failing to find specifically upon this matter and by not including the amount of it in the balance found due from defendant to plaintiff, the court allowed defendant to retain the proceeds of this note. While it is true that the office secretary, Miss Poma, did considerable of the work of the defendant as secretary for the Medical Center, and probably a portion of the defendant's work as such secretary was legal in its nature, still it was competent for the parties to agree that such salary should be retained by the defendant. Inasmuch as there is evidence to support the court's position, this court has no power to rule otherwise. The testimony of defendant if believed, was sufficient to support the court's action. Evidently the court believed that testimony.

### The Hartley Estate Matter.

The court found that in 1932 the defendant was employed in certain litigation by the heirs of Jennie E. Hartley, deceased, upon a contingent basis and that it was agreed between plaintiff and defendant that any fee received would not be a partnership asset, but should be retained by defendant personally. The fee received by defendant was $5,512.79.

Here again, the defendant testified to such an agreement; the plaintiff denied it. Defendant's wife corroborated his testimony. Apparently, office facilities and the office secretary were used in performing this work, the pleadings contained the names of both partners, and the bill was rendered in the partnership name. However, it was competent for the partners to agree that the defendant, who did all the legal work, might keep the fee. The evidence of defendant and his wife supports the finding and this court is bound by the lower court's finding on a dispute of fact.

### 1932-1935 Fees.

As hereinbefore set forth, when plaintiff received his injury and in June, 1930, the division of fees, according to the oral agreement of the parties, was to be equal. Plaintiff's recovery from his incapacity was exceedingly slow. Defendant testified, and the court found, that on March 1, 1932, the basis of division was again changed by agreement of the parties, and that thereafter the division of the net earnings was to be, and was, 45 per cent to the plaintiff and 55 per cent to the defendant. Plaintiff denied that there was any such agreement. During this period, from March 1, 1932, until December, 1935, when the court found that a still different basis of division was agreed upon by the parties, defendant, who had charge of the books of the partnership, divided the fees on this 45-55 per cent basis. Plaintiff asked the court to compel the defendant to return to plaintiff the sum of $968.94 which on the 50-50 basis would have been the sum to which plaintiff would have been entitled additional to the amounts already received for the period 1932-1935 based upon the new computation. This the court declined to do, evidently believing that defendant's story that the division basis had been mutually changed was true. While plaintiff's testimony was to the contrary and there apparently were checks issued during this period in equal amounts to the partners thereby tending to corroborate the plaintiff's version of the matter, we are bound by the finding of the trial court, because there is evidence, the defendant's testimony, to support it. In addition, plaintiff on December 17, 1935, received from the office secretary a statement of the fee situation at that time, such statement showing fee allocations on the basis of this new agreement, and made no objection to it.

### 1936-1938 Fees.

A similar situation arises over the fees received by the partnership from December, 1935, to its dissolution on April 15, 1938. The court found that the basis for the division was again changed by mutual agreement in the latter part of December, 1935, effective as of January 1, 1936, so that the net earnings of the partnership were to be divided as follows: All fees received from clients were to be distributed four-twelfths to the partner who produced the client, for the production of the business; three-twelfths to the partner handling or performing the services, subject to equitable adjustment if both partners should handle or perform the services; five-twelfths to the common fund hereinafter referred to. All fees from clients secured by the partners jointly were to be distributed three-twelfths to defendant for handling or performing the services and nine-twelfths to the common fund. Out of the common fund all overhead expenses were to be paid. Any deficit in the common fund should be equitably charged against the partners in proportion to the contributions to the fund from the group of clients secured by the partners separately, any surplus in the common fund remaining at the end of the year would be distributed in the same proportions. Defendant testified that this arrangement was agreed to by plaintiff. Plaintiff denied it. In addition to defendant's testimony concerning the matter, the evidence showed that each month from January 1, 1936, until the partnership dissolution, defendant made up statements of the fees received, and divided them in the proportions set forth in this finding of the court, accompanying the statement with a check to plaintiff for the amount of money represented as being due from the firm to plaintiff. These statements showed the producer of the month's business, the one who handled it, the division of the fees, and the amount due each partner based upon the claimed agreement of December, 1935. Plaintiff cashed his checks as received. The difference between the amount the plaintiff would have received over this period on the 50-50 basis he contends for and the amount he did receive on this basis, referred to in the testimony as a production and handling agreement, was $2,531.14, which amount plaintiff contends should have been awarded him. Here, again the court accepted defendant's version rather than plaintiff's, and

this court must accept the lower court's finding. A very strong circumstance, of course, in support of defendant's version of the matter is the monthly acceptance and cashing by plaintiff for approximately sixteen months, of the checks issued by defendant to plaintiff accompanied by statements showing that the amounts were arrived at on the basis claimed by defendant to have been mutually agreed.

### The Hastings Fee.

Plaintiff complains because the lower court required him to account to the partnership for a fee in the sum of $1,250 received by plaintiff from L. H. Enemark as guardian of the estate of Elizabeth Parker Hastings, an incompetent, for legal services rendered the guardian by the partnership. Elizabeth Parker Hastings was born in San Francisco in 1882 and was a granddaughter of S. Clinton Hastings, first Chief Justice of the Supreme Court of California. In 1874 he created a trust for his wife and children, which included the mother of Elizabeth. In 1889, L. M. Hoefler was appointed guardian of the estate of Elizabeth Parker Hastings, the court finding her to be an incompetent. Thereafter, Miss Hastings and her mother removed to England.

In 1909 Miss Hastings wrote to plaintiff from London requesting him to represent her in the litigation in California as her attorney. Plaintiff proceeded to attempt to restore her legal rights and to obtain her property for her. Many services were rendered by plaintiff from 1909 until 1930. In May, 1928, L. M. Hoefler resigned as guardian and L. H. Enemark was appointed in his place and plaintiff was appointed his attorney. When plaintiff was injured in June, 1930, Chas. W. Slack was selected by the guardian as his attorney in place of plaintiff. Evidently all services rendered in this matter were performed by plaintiff, defendant taking no part therein. Mr. Slack petitioned the court to restore Miss Hastings to competency, which the court did. On the final account and report of the guardian filed in May, 1931, Mr. Slack signed plaintiff's name as well as his own as attorneys of record. This account shows the following payments to plaintiff: July 11, 1928, $250, June 19, 1930, $1,000, November 13, 1930, $500, November 29, 1930, $1,250. All of the foregoing payments except the last one for $1,250, went into the partnership account. This $1,250 payment

is the one for which the court found that plaintiff should account. In the estate account these fees, totaling $3,000 are set forth as payments to plaintiff under an agreement between the guardian and Miss Hastings. The probate court account approved these amounts as fees for the services of the attorneys for the guardian.

Prior to the date set forth in the above guardianship account, plaintiff in 1912 had received fees from the guardian in the sum of $1,000, in 1923, $150, 1925, $250, and in 1926 he received $250. It is plaintiff's position that represented in this sum of $3,000 which he received from the guardian were services rendered to Miss Hastings prior to the formation of the partnership of plaintiff and defendant in 1927, for which he had not been paid. Therefore, he contends that although he turned into the firm, the first three payments received by him from the guardian after the formation of the partnership, he is entitled to keep the final payment of $1,250 as payment for the services rendered by him before he became a partner. He contends that the $3,000 was not in payment of his services as attorney for the guardian, but included a fee for his services to Miss Hastings individually for his personal representation of her. Defendant contended that this fee was solely for services to the guardian after the formation of the partnership and therefore was a partnership matter. Supporting defendant's position is the wording of the final guardianship account which bore the names of both plaintiff and Mr. Slack, and which Mr. Slack testified he submitted to and went over with plaintiff. This account states, ''This said guardian, at various times during the period embraced in the foregoing account, commencing on the 11th day of July 1928, and ending on the 29th day of November 1930, has shown in the foregoing account under date of the said 29th day of November 1930, 'pay to A. J. Treat, for legal services rendered to this said guardian, the total sum of $3000.00, the final payment to the said A. J. Treat of the sum of $1250.00 being agreed upon between this said guardian and the said Elizabeth Parker Hastings and her said solicitor, A. C. Probyn-Williams.' '' Also in support of defendant's position, is the wording of the decree settling the account in which the court finds as reasonable the payments made by the guardian ''for the services of the attorneys for

said guardian," and for the "costs, services and expenditures of the solicitors of the said Elizabeth Parker Hastings in London, England." The court thus differentiated between services by the attorneys for the guardian which included plaintiff, and services of the solicitors for Miss Hastings in London which, of course, did not include plaintiff.

Mr. Slack was asked by plaintiff if he had an opinion as to the reasonable value of plaintiff's services during the period of the guardianship and prior thereto and he stated "No, not as to an opinion based upon my knowledge of his services prior to that time." He was then asked "Did you have any discussion with Mr. Enemark" (the guardian of the incompetent) "in this connection?" To which he answered in the affirmative. He was then asked "What did Mr. Enemark state to you, if you recall?" The court sustained the defendant's objection to this question as being incompetent, irrelevant, immaterial and hearsay. Plaintiff complains of this ruling, contending that as Mr. Enemark was dead the answer should have been permitted, as it would have been an admission against his interest. Just how this would have been an admission against interest does not appear, and just why it was not hearsay likewise does not appear. It does not appear also just what plaintiff expected that Mr. Slack would say that Mr. Enemark had said.

Taking into consideration all the circumstances in the Hastings fee matter, the most that could be said is that the facts are reasonably subject to two interpretations, and, of course, this court under such circumstances must follow the interpretation given by the trial court. However, the situation is really stronger than that as there are facts as outlined above which support the court's conclusion rather than that of the plaintiff.

### The Rodden Estate.

■ The court found that plaintiff performed services for the administratrix of the estate of Rodden for which he became entitled to a fee in the sum of $200, for which he failed to account to the partnership. The circumstances were these: the services to the estate were a partnership matter. Dr. Rodden, the deceased, had performed dental services to plaintiff for which plaintiff was indebted in the sum of $100. Plaintiff testified that he informed the administratrix that

when she paid the bill $100 would go to defendant, and $100 would be paid back to her in settlement of the plaintiff's dentistry bill. However, plaintiff assisted the administratrix in the proceedings necessary to close the estate and it was closed up without the payment of the attorney's fees. In view of the fact that to close an estate the court must be informed that all expenses of administration, including attorney's fee, have been paid, it is apparent that the court was right in assuming either, that plaintiff had collected the fee, or without the consent of his partner, had offset the $200 partnership attorneys' fee against his personal indebtedness to the estate in the sum of $100. This latter is undoubtedly what occurred. Plaintiff never denied it. In view of that fact, the court was justified in requiring plaintiff to account to the partnership for the fee.

### Fees Subsequent to the Dissolution.

At the time of the partnership dissolution on April 15, 1938, there were certain unfinished matters in the office. As to these the court found that the fees received from them should be divided on the production and handling basis rather than the 50-50 basis contended for by plaintiff. This subject has already been discussed hereinbefore, and as there stated, there is sufficient evidence to support the court's finding. Included in these fees was one in the Wilckie case in the sum of $1,440 which plaintiff contends the court erroneously classified as having been produced by defendant. Defendant testified that the sister of the injured Mr. Wilckie came in to see him about taking the case. Defendant had done some work for the sister in 1930 and plaintiff had done some work for her prior to that time. It appears that on the first occasion of the sister calling at the office in the Wilckie matter she asked for defendant, and on learning that he was out, declined to see plaintiff, returning at a later date to see defendant. It cannot be said that the court was wrong in considering this case, under all the circumstances, as being produced by defendant. Defendant contends that a stipulation made by counsel towards the end of the trial of the case to the effect that counsel would meet and endeavor to ascertain just what fees were in question between the parties, and would then notify the court which ones to pass upon, the court to

assume that those not called to its attention were not being questioned, included the Wilckie fee, which was not thereafter called to the court's attention. This stipulation is extremely ambiguous and it is impossible to tell from the record whether or not the Wilckie fee was included among those to be specifically mentioned to the court or deemed not in dispute.

### Defendant's Appeal.

Defendant makes four major contentions on his appeal. They are, 1. That the court failed to find on specific issues. 2. The Medical Center stock situation. 3. The finding that certain clients were produced by plaintiff. 4. Interest.

■ 1. Court's Failure to Find on Specific Issues.

Defendant complains that the lower court failed to make specific findings on charges made in the complaint by plaintiff that defendant fraudulently kept the books of the partnership, intentionally did not keep true books, and fraudulently concealed the true condition of the partnership business from his partner, the plaintiff, and also failed to find specifically upon the defenses of laches and estoppel raised by defendant as to matters set forth hereinafter in contentions 2 and 3. It is true that the court did not make these specific findings but the determinations it made as to the allocations or divisions of the fees between the partners actually constituted findings on these particular subjects. These questions of laches and estoppel will be more completely discussed under contentions 2 and 3. As to the fraud matters, the very failure to find constitutes a finding in favor of defendant thereon. The court divided the fees in accordance with what it found to have been the arrangement at the particular time between the parties, without any intimation that there was any fraud on the part of defendant, or his partner. Apparently, the court dealt with the disagreements of the partners as one of the cases which frequently occur of partners disagreeing as to their respective understandings of their arrangement. The very failure to find that there was any fraud in this case, is really a finding strongly in defendant's favor. Defendant has been injured in no way, by the court's action in this behalf. In many instances, only a few of which have been questioned by either party on this appeal, the court found that one party or the other should

account for fees, or portions thereof, which that particular party thought he ought to be able to keep, so that the misunderstanding as to the proper division of fees was in no wise limited to only one of the partners.

2. The Medical Center Stock.

The court found that the partnership had rendered certain legal services to the Medical Center and on or about October 24, 1931, billed the corporation in the sum of $7,000 for those services, that the corporation paid the partnership the sum of $1,000 in cash, which amount went into the partnership; that the corporation issued in the name of, and to, the defendant, 60 shares of its common capital stock of the par value of $100 per share in payment of the other $6,000 of the bill; that the corporation was credited with that sum on December 5, 1931, on the books of the partnership, but, that at all times, defendant retained and still retains the 60 shares of the Medical Center Corporation, and that defendant should account to the partnership for that stock, together with the dividends which he has received thereon, amounting to $713.50. As to this stock, defendant admits receiving the stock as set forth in the court's finding, but contends first, that it was agreed between him and plaintiff that he should retain the stock as his own; secondly, that the plaintiff is estopped from questioning this transaction, and thirdly, that the plaintiff is guilty of laches in connection with it. Plaintiff most strenuously denies that there ever was any such agreement as claimed by defendant. The court took plaintiff's version of the matter and found that there was no such agreement. Moreover, the court's order that defendant account for this stock was a finding against defendant on the issues of both estoppel and laches.

The defendant does not seriously contend that the finding that no such agreement was made is unsupported by the evidence. The plaintiff's denials alone would be sufficient in this respect. But defendant does contend that under the circumstances shown, he was entitled to believe that plaintiff had assented to his keeping the stock, and that plaintiff is now precluded from urging that he did not assent, by the doctrines of laches and estoppel.

It is necessary to consider in detail the circumstances upon which defendant bases this claim. Defendant, as stated

heretofore in connection with plaintiff's appeal from the finding of the court concerning other fees paid the partnership by the Medical Center, was secretary and plaintiff was stock transfer agent of the corporation. The services rendered to the corporation were found by the court to have been rendered while plaintiff was incapacitated, and therefore were rendered by defendant, although the corporation, of course, was a joint client. However, the services were rendered during the period when the defendant contended and the court found that the division of fees between the parties was to be 50-50. Defendant testified that plaintiff had agreed that defendant could keep the stock because of his incapacity to assist in handling the matter. Plaintiff most emphatically denied this. Defendant contends that but for his belief that plaintiff had agreed that he might keep this stock, defendant would not have been willing to continue on a partnership basis where he was doing all, or practically all, the work and plaintiff was getting one-half of the fees. There is no evidence other than his statement in the briefs that he would not have continued on.

The Corporation Commissioner issued a permit to issue stock to defendant, and others. The provision applicable here is "To sell and issue 60 shares of its common capital stock to R. C. Ogden in partial consideration for legal services rendered by him to applicant." The permit further issued in 1931, provided that a copy should be served on the transfer agent, A. J. Treat. Plaintiff did not deny receipt of a copy of the permit, although defendant testified he had no definite recollection of showing plaintiff the permit when plaintiff signed the stock certificate as transfer agent. Plaintiff at the time he signed the certificates for the shares in defendant's name signed other certificates for other persons as well, some 25 certificates in all, and claimed he did so as a matter of routine without realizing that the stock in part payment of the fee, was being issued to defendant alone.

While it is not too clear how plaintiff could have failed to realize that he signed a certificate for 60 shares in defendant's name, if, as testified to by plaintiff, he made a memorandum of the names in which the several certificates were issued, the court apparently believed his story. The certificates were signed on December 5, 1931, six months after plaintiff's accident and during a time when admittedly plaintiff's

mental faculties were affected by the injuries, and plaintiff was wholly incapacitated from the practice of the law. His recovery both mentally and physically was slow and took a great length of time. Undoubtedly, the court had this in mind in its decision. Plaintiff's slow recovery explains and justifies his failure to realize the situation and to question it from the time of the stocks' issuance in 1931 until the partnership dissolution in 1938. Again, the relationship between the parties was fiduciary, plaintiff at the time, by reason of his injury, being the weaker member of the association. Certainly the court under those circumstances should be hesitant in applying the rather technical defenses of estoppel and laches, particularly, as it concerns a transaction in which one partner reaped a very decided advantage which was completely out of line with the 50-50 arrangement which both parties claim existed at the time. Certainly, the burden is on the defendant to show that he acted in the utmost good faith and that plaintiff, because of his then condition, had full and complete understanding of the whole transaction. Evidently the court felt that defendant did not meet that burden. The evidence is reasonably susceptible of that interpretation.

As stated before, defendant objects to the fact that the court did not find expressly on the issue of estoppel and laches, in this matter. The court made a general finding, "That all of the allegations of the complaint and answer and cross complaint, inconsistent with, or contrary to, the findings herein expressly made, are not true." Plaintiff contends that this constitutes a finding on the issues of estoppel and laches. Perhaps it does, as it is not quite clear what this finding means. In any event, the finding by the court that defendant is not entitled to keep the stock constitutes a finding against him on these issues.

The ledger kept in the office showed a credit entry in favor of the Medical Center "Oct. 25 (1931), by common stock agreement $6000." The duplicate bill kept by the partnership showed the charge of $7,000 for services and then bears this notation "1931. Dec. 5, accepted $6000 stock." These entries were made by Miss Poma, the office secretary, the employee of both parties. Defendant contends that plaintiff is charged with notice of whatever appeared in the books

and therefore cannot claim, as he does, that he did not learn of the issue of the stock until March, 1938; and that if he didn't know of it, he was at least put on inquiry. The court found and there was evidence to support it, "that during the entire partnership the partnership books were kept by defendant, or directly under his supervision and management, and that during said period the management of the business and office affairs and records of the partnership were directly under his control, and that the said defendant during said period did exercise the management and control over the office affairs, records and business of the partnership." In view of this fact, the fiduciary relationship between the parties, the plaintiff's injuries, and his condition thereafter, it is reasonable to hold that plaintiff was entitled to rely upon the assumption that defendant was keeping the books in accordance with their mutual understanding, and that plaintiff was under no duty to make an independent inspection at the risk of being held to have assented to whatever mistakes or interpretations defendant may have made. The evidence does not establish that plaintiff had actual notice of the entries at a time when he could have understood them, or even at all. He was entitled to rely on his partner's accuracy, and has the right to have adjusted any errors which may have been made.

3. Certain Clients Classified as Produced by Plaintiff. As pointed out heretofore, the court found that during a certain period of the partnership, the division of fees was to be on a production and handling basis, 4/12ths of the fees to go to the partner who produced the business. The court in the process of the accounting, passed upon the question of who produced the clients in connection with a considerable number of fees. On many of these neither party has objected to the court's classification. As to some, plaintiff complained and included them in his grounds of appeal. These have already been passed upon hereinbefore. Defendant complains of four. They are referred to as Townsend's, The Livermore Sanitarium, the Estate of Robbins and the Estate of Levy. The court classified all four as clients produced by plaintiff. Defendant in the books of the partnership had classified these as office, or joint clients. Defendant concedes that these clients had originally been clients of plaintiff, prior to his in-

jury. Defendant's theory is that they were properly classified as joint clients for the reason as he testified, that after plaintiff's injury they would not have continued to do business with plaintiff because of his incapacity, and only continued with the partnership because defendant was going to and did take care of their business. This, however, is not a fair test, and ignores the agreement made by the parties that the party who originally produced the business should get 4/12ths of the fee. On the interpretation claimed now by defendant, plaintiff could never have been considered the producer of any business, although many of the clients of the office actually were brought there by him. After his accident (and this production and handling arrangement was only made after the accident), none of his former clients would have continued with plaintiff, because admittedly he was in no condition to handle their business. The defendant himself classified a number of clients during this period as having been produced by plaintiff who were in the same category as these four, namely, clients brought to the office by plaintiff before his injury and who continued with the office after the injury, in spite of the fact that plaintiff could not take care of them and defendant did. Likewise, the court made the same classification as to others in the same category. Here again, the interpretation and classification made by the court is a reasonable one and supported by the evidence and cannot be disturbed here.

. Defendant stresses his claim of estoppel in connection with this matter. Commencing with 1936, when the production and handling basis went into effect, defendant rendered monthly statements to plaintiff which accompanied checks delivered to plaintiff for his share in the profits as estimated by defendant. Plaintiff made no objection to the statements and cashed the checks. These statements clearly showed the division of the clients into three classes, Treat, Ogden, and office clients and lists the clients under each class. It clearly shows the apportionment to each partner of 4/12ths of the fee on clients produced by him. Defendant contends that the acceptance of these statements and the cashing of the checks accompanying them completely bars the plaintiff from questioning the divisions shown on them. The division of fees of the four clients in question here were shown in these

statements. By this time plaintiff had recovered from his injury to the extent that he was doing some legal work. While the court would have been justified in holding that plaintiff was completely bound by these statements, we cannot say, in view of the fiduciary relationship, the condition of plaintiff and all the circumstances, that the court was wrong in allowing plaintiff to go behind these statements. As said before, these men were partners and a hard and fast rule that one of them, admittedly the weaker, and the one who was not handling the books, is completely bound by the acts of the other, even though at the time apparently acquiesced in by the former, would not be fair. In view of the relationship of the parties, a court of equity should be entitled to examine their transactions and if unintentionally or otherwise, an injustice would be done to one of the partners by imposing a hard and fast rule that where a division between them is made, the partner must immediately object to the actions of his partner or be forever foreclosed from showing that the action was not in accordance with their agreement, then the court should not impose such a rule which would be inequitable, unfair and overlook the fact that a partnership is and should be based upon a mutual confidence.

### Finding XIX.

Defendant complains that in Finding XIX the court found that he was accountable to plaintiff in the sum of $169.70 on account of partnership property retained by the respective parties. Defendant contends the amount should be $113.55 instead of $169.70. The court apparently arrived at the amount by taking the stipulation of the parties, in which it was agreed that plaintiff was to purchase from the partnership certain books for $7.50, and the defendant to purchase all the rest of the partnership property for $345.90. The total due the partnership from both parties, therefore, was $353.40. The court then decided to split this amount equally between the partners, and in accounting required defendant to pay plaintiff his one-half less one-half the money plaintiff owed the partnership under the stipulation. Defendant contends that instead of splitting this amount equally between them, the court should have taken into consideration the periods in which the property was purchased and divided

the property in accordance with the fee basis for that period. In view of the slight difference, and the fact that the written agreement provided the assets were to belong equally to the partners and that no other arrangement was ever made between the parties as to the property of the partnership, although there was a change in basis of fee division, it would seem that the court's division of the property equally between them was eminently fair, and justified.

### Hastings Estate Fee Interest.

Defendant contends that the court should have charged plaintiff interest on the $1,350 fee received by plaintiff from the Hastings Estate and not accounted for to the partnership. Apparently, the court felt that, inasmuch as it did not charge defendant interest on any of the sums which it found that defendant had failed to account for to the partnership, it would likewise not charge plaintiff any interest. Under all the facts and circumstances of the case, and particularly this fact, the action of the court in denying interest was fair and equitable.

Judgment affirmed.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing was denied January 9, 1943, and appellants' petitions for a hearing by the Supreme Court were denied February 8, 1943.